NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0306n.06

No. 19-3945

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ASHLEY ZURESS,                                   )
                                                 )
    Plaintiff-Appellant,                          )
                                                 )
        v.                                     )
                                                 )
CITY OF NEWARK, OH; OFFICER DAVE                 )
BURRIS, in his individual and official capacities, )
                                                 )
    Defendants-Appellees.                         )
                                                 )

**FILED**
May 28, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
SOUTHERN DISTRICT OF
OHIO

BEFORE: BOGGS, GRIFFIN, and LARSEN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Officer Dave Burris used a police dog to help arrest plaintiff Ashley Zuress. During the arrest, the dog bit Zuress. Afterwards, she brought this 42 U.S.C. § 1983 action, alleging a Fourth Amendment excessive-force violation for both (1) deploying the dog and (2) allowing the dog to continue its bite. The district court granted summary judgment in Burris's favor on the basis of qualified immunity and Zuress appeals. For the reasons expressed below, we affirm.

I.

City of Newark police were surveilling a house in Newark, Ohio, because a confidential informant had told them it was a drug house. At the same time, they were looking for Jeff Grooms—plaintiff Zuress's boyfriend and the brother of a resident of that house—because he was the subject of an outstanding warrant for unpaid child support. The police department had also

told Burris that some detectives wanted to talk to Grooms about an armed robbery. After a confidential informant told Burris that Grooms had been staying at his sister's residence, police also monitored it in order to detain Grooms.

On the day of the incident at issue, Burris was patrolling with his police dog—Ike—and Officer April Hunt. While patrolling, Burris received a tip from a confidential informant that Grooms had arrived at his sister's residence in a tan Jeep Renegade and had entered the house. Burris, Ike, and Hunt then drove to the residence to surveil it. There, Burris saw the Jeep leave the house and followed it. After the Jeep committed a traffic infraction, Officer Hunt turned on the cruiser's emergency lights.[1] The Jeep slowed down, but it passed multiple areas where it could have safely stopped. Once the vehicle finally stopped, Grooms abruptly opened the driver's side door and fled. While Grooms was fleeing, Burris got out of the police cruiser and deployed Ike. However, Burris and Ike were unable to track Grooms because they did not have their tracking equipment.

About nineteen seconds after the Jeep stopped, and before Burris and Ike returned, the Jeep drove away without authorization. Thereafter, once Burris and Ike returned, they drove with Officer Hunt after the Jeep.

While the Jeep was fleeing the scene, another officer—Jon Purtee—intercepted it and pulled it over. As Burris, Hunt, and Ike pulled up behind Purtee's cruiser, Purtee assumed a shooting stance and used his driver's side door as cover. Purtee commanded the driver, plaintiff Zuress, to exit her vehicle and when she did she was facing the officers.[2] For the safety of the officers, Purtee ordered Zuress to turn around. But Zuress did not comply; Purtee directed Zuress

---

[1]Multiple video cameras captured the material facts of this case.

[2]Purtee directed Zuress to step out of the vehicle three times before she exited the vehicle.

to "face away" five times before she turned around. Zuress's noncompliance continued as she turned back around and faced the officers. Further, she did not follow Purtee's command to walk backwards towards him. Instead, Zuress argued with Purtee, waved her hands around, and reached down towards her waistband, adjusting her shirt or pants.

Purtee warned Zuress that he would deploy the dog if she did not comply. One or two seconds after Purtee gave that warning, Burris released Ike, who advanced toward Zuress and her car. As he was trained to do, Ike initially ignored Zuress and entered the car to check for other occupants. While Ike was checking the car, Burris approached Zuress. At roughly the same time that Burris made physical contact with Zuress, Ike emerged from the car, bit down on Zuress's left arm, and held his bite to assist with the arrest. Then Zuress, Burris, and Ike all fell to the ground.

While Ike and Burris gained control of Zuress, other officers advanced; Burris directed them to check the car for other occupants. Once the car was cleared, another officer took Burris's place on top of Zuress to secure her while Burris moved over to Ike to get him to release his bite. After struggling with Ike for about twenty-four seconds, Burris got Ike to release his bite. Burris then moved Ike away from Zuress.

Zuress brought this action against Officer Burris pursuant to 42 U.S.C. § 1983.[3] She alleged that Burris violated her Fourth Amendment right to be free of unreasonable government seizures when he deployed the police dog against her and allowed the dog to continue to bite her after she had been subdued. Zuress claimed excessive force in both the initial deployment of the dog and its continued bite. Officer Burris moved for summary judgment, invoking qualified

---

[3]Zuress also brought a battery claim against Burris and a municipal-liability claim against his employer, the City of Newark. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The district court ruled against Zuress at summary judgment on these claims, and they are not a part of this appeal.

immunity. The district court granted summary judgment in Burris's favor and entered judgment. Zuress has timely appealed.

## II.

We review de novo the district court's grant of summary judgment. *Burnette Foods, Inc. v. U.S. Dep't of Agric.*, 920 F.3d 461, 466 (6th Cir. 2019). Summary judgment is warranted if a movant shows that (1) "there is no genuine dispute as to any material fact," and (2) it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact," the non-movant has two options: (1) identify record evidence that demonstrates genuine disagreements over material facts that a factfinder must resolve, or (2) show that—on undisputed material facts—the non-movant is not entitled to judgment as a matter of law. *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 1109 (2020). "[I]n considering the evidence in the record, the court must view the evidence in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Id.* (citation and internal quotation marks omitted).

## III.

### A.

Defendant contends that he is entitled to summary judgment on the grounds of qualified immunity. Once a defendant raises qualified immunity, "[a] plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019). This requires establishing "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). We may address the qualified-immunity requirements in any order. *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. 2011). When a

plaintiff's excessive-force claim fails on the violation-of-a-constitutional-right requirement, we need not reach the clearly-established-right requirement. *Jones v. City of Cincinnati*, 736 F.3d 688, 696 (6th Cir. 2012) (determining that because the defendants had not violated the constitution, it was not necessary to decide whether plaintiff's constitutional rights were clearly established); *cf. Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

B.

"An excessive-force claim turns on whether an officer's actions were 'objectively reasonable' given the circumstances he confronted." *Shanaberg v. Licking Cty.*, 936 F.3d 453, 455–56 (6th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). This is an objective inquiry. *Id.* at 456. "[W]e ask how a reasonable officer would have seen things in the heat of the moment, not in hindsight." *Id.* To answer that question, our inquiry includes considering the following factors from *Graham v. Connor* (the "*Graham* factors"): "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The "overarching determination" we must make, however, "is whether the 'totality of the circumstances' justified the degree of force an officer used." *Shanaberg*, 936 F.3d at 456 (citation omitted).

IV.

A.

The first alleged unreasonable use of force was deploying the dog to help apprehend plaintiff during the second traffic stop. The *Graham* factors overall, and the totality of the circumstances, indicate that deploying the dog was reasonable.

1.

The immediate-threat factor weighs in defendant's favor for several reasons. First, plaintiff had just traveled from a known drug house. Second, plaintiff's traveling companion—Grooms— was under surveillance because there was an outstanding warrant out on him (albeit for unpaid child support). Additionally, Grooms was reportedly a drug addict, and detectives wanted to speak with him about an armed robbery. Third, plaintiff's traveling companion had abruptly fled on foot from the first traffic stop and plaintiff herself had fled the scene in her vehicle—without authorization—after only about nineteen seconds. Fourth, at the second traffic stop, plaintiff was an unknown quantity and acted unpredictably. She was standing right next to the driver's seat of her vehicle with the door open. That meant she could have quickly attempted to operate the vehicle again or reached items (such as weapons) inside the vehicle. Plaintiff asserts that she was unarmed,[4] but a reasonable officer would not have known that at the time. Fifth, it was unknown whether more people were in the vehicle and, if so, whether they were armed. Finally, and perhaps most importantly, plaintiff was not complying with the officers' commands; she was arguing, waving her hands around, turning to face the officers, and even reached for her waistband where a weapon could have been. *See Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 306 (6th Cir. 2017)

---

[4]Following Zuress's arrest, a loaded handgun was discovered on the floorboard under a bag in her vehicle on the front passenger's side.

("While [the suspect] was in one sense complying with [the officer's] command to stop, [the suspect's] further turning around with his hand by his waist presented itself as an immediate threat to the officer.").

On balance, the resisting factor weighs in defendant's favor. "Active resistance" and "passive resistance" are materially different. *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015); *Jackson*, 678 F. App'x at 306. "Active resistance includes 'physically struggling with, threatening, or disobeying officers.'" *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citation omitted). It also includes "verbal hostility coupled with failure to comply with police orders." *Jackson*, 678 F. App'x at 306; *see also Rudlaff*, 791 F.3d at 641. Between exiting her vehicle at the second traffic stop and the deployment of the canine, plaintiff did not have a physical struggle with the officers, and she did not orally threaten them. During that time, however, plaintiff argued with the officers and repeatedly failed to comply with their commands. We conclude that plaintiff's repeated non-compliance—coupled with her arguing with the officers—put her conduct just over the line into the active-resistance category.

Only the severity-of-the-crime factor weighs in plaintiff's favor. Before defendant deployed the dog, a reasonable officer would have suspected plaintiff of having committed two misdemeanors. First, plaintiff—without the permission of the police and only about nineteen seconds after stopping—drove away from the first traffic stop. A reasonable officer would view that conduct as a violation of Ohio Revised Code § 2921.31(A), which provides:

> No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

The officers were lawfully attempting to arrest plaintiff's traveling companion; driving the car away from the scene "hamper[ed] or impede[d]" the police officers' "lawful duties." Ohio Rev. Code Ann. § 2921.31(A). The maximum penalties for violating § 2921.31(A)—in its default second-degree misdemeanor form—are ninety days in jail and a fine of $750. Ohio Rev. Code Ann. §§ 2929.24(A)(2), 2929.28(A)(2)(a)(ii).

Second, during the subsequent traffic stop, plaintiff repeatedly failed to comply with lawful orders from the police officers to turn her back to them and walk backwards towards them. A reasonable officer would have viewed that conduct as violating Ohio Revised Code § 2921.331(A), which prohibits "fail[ure] to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic." The maximum penalties for violating § 2921.331(A)—in its default first-degree misdemeanor form—are six months in jail and a $1,000 fine. Ohio Rev. Code Ann. §§ 2929.24(A)(1), 2929.28(A)(2)(A)(i).

A violation of each provision is a potential felony. Ohio Rev. Code Ann. §§ 2921.31(B), 2921.331(C)(4)–(5)(a). Defendant, however, has not articulated—beyond mere assertion—why a reasonable officer would have viewed plaintiff's suspected violations of those provisions as felonies rather than misdemeanors.[5] Because the crimes a reasonable officer would have suspected plaintiff of having committed were non-violent misdemeanors without harsh penalties, the severity-of-the-crime factor weighs in plaintiff's favor.

---

[5]We note, however, that Ohio Revised Code § 2921.31(B) provides that "[i]f a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree." Fleeing from a traffic stop in a car can pose a risk of harm to people, especially if the police must chase down a driver who refuses to stop his car.

2.

The *Graham* factors are not exhaustive. *See Graham*, 490 U.S. at 396. "The overarching determination we make is whether the 'totality of the circumstances' justified the degree of force an officer used." *Shanaberg*, 936 F.3d at 456 (citation omitted). When we have concluded that a constitutional violation occurred in canine excessive-force cases, there was typically "a poorly trained dog that attacked suspects without warning or command." *Ashford v. Raby*, 951 F.3d 798, 803 (6th Cir. 2020). Here, however, plaintiff does not argue that the dog was inadequately trained or that the dog attacked without warning or command.[6] Given the overall orientation of the *Graham* factors, and considering the totality of the circumstances, it was reasonable to deploy the police dog because plaintiff had ready access to her vehicle and possible weapons, had a traveling companion whose whereabouts were unknown, was refusing to comply with commands, and was arguing even though officers had their weapons trained on her. Accordingly, we conclude that the deployment of the police dog did not constitute a violation of the Fourth Amendment.

B.

The second alleged unreasonable use of force was the delay in stopping the dog bite after plaintiff had been subdued. We have acknowledged that it is possible for "a delay in calling off [a police] dog . . . [to] rise to the level of an unreasonable seizure." *Greco v. Livingston Cty.*, 774 F.3d 1061, 1064 (6th Cir. 2014). But the facts here do not support a Fourth Amendment violation. Once defendant and the dog made physical contact with plaintiff, there were about five seconds between when plaintiff was subdued and other officers reached plaintiff, defendant, the

---

[6]In plaintiff's complaint, as part of her municipal-liability claim, she alleged that Newark provided inadequate use-of-force training to Burris and the dog. But that argument and the municipal-liability claim are not a part of this appeal.

dog, and the vehicle. Approximately three seconds later, defendant signaled the other officers to check the vehicle. After roughly four more seconds, defendant started to move off of plaintiff so another officer could take his place holding her down. Defendant's switch from holding plaintiff down to manually attempting to get the dog to release its bite took about three seconds. This means that from the time defendant had another officer to take his place holding down plaintiff to when he started to get the dog to release its bite, about eleven seconds elapsed. Such a short amount of time—some of which involved defendant directing other officers to check the vehicle for officer-safety purposes—was not the kind of delay that "rise[s] to the level of an unreasonable seizure." *Id.*; s*ee also Ashford*, 951 F.3d at 803–04 (concluding that it was not "the stuff of a Fourth Amendment violation" when a dog bite lasted about "four to five total seconds after" the dog pulled the plaintiff out of a vehicle and when "[a]t most, one could [have] argue[d] that [the officer] could have called the dog off a second or two sooner").

Additionally, although the bite lasted about twenty-four seconds once defendant started attempting to get the dog to release, a critical component of this type of Fourth Amendment violation was missing. For this sort of Fourth Amendment violation to occur, the government must terminate a person's "freedom of movement *through means intentionally applied*." *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) (quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989)). While defendant was working to get the dog to release his bite, the continued bite was not a "means intentionally applied." *See id.* at 492–93 (emphasis omitted) (determining there was not a Fourth Amendment violation because it was not the officer's intention for the dog to bite the plaintiff); *see Neal v. Melton*, 453 F. App'x 572, 577–78 (6th Cir. 2011) (concluding that there was not an excessive force Fourth Amendment violation because the dog's contact with one of the plaintiffs was "not the type of intentional or knowing contact [that is] required"). The second

alleged use of unreasonable force, therefore, did not constitute a violation of the Fourth Amendment.

For these reasons, plaintiff has failed to demonstrate "that [defendant] violated a statutory or constitutional right" and therefore has not rebutted defendant's claim of qualified immunity. *Jacobs*, 915 F.3d at 1039 (citation omitted). Accordingly, the district court correctly granted summary judgment in defendant's favor.

V.

Finally, plaintiff raises one additional issue. She contends that summary judgment was improper because the testimony of her expert witnesses established a genuine dispute of material fact regarding whether the uses of force were excessive. We disagree for two reasons. First, in plaintiff's briefing, she concedes that the facts are undisputed. There cannot be a genuine dispute of material fact if no facts are disputed. Second, plaintiff argues that whether a use of force was reasonable is a question of fact. But in our circuit, whether a use of force was reasonable is "a pure question of law." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)); *see Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) ("The Supreme Court . . . clarified the summary-judgment standard for excessive-force claims, rejecting the argument that the question of objective reasonableness is 'a question of fact best reserved for a jury.'" (quoting *Scott*, 550 U.S. at 381 n.8)). The testimony of plaintiff's experts on a legal question cannot establish a genuine dispute of a material fact.

VI.

For these reasons, we affirm the district court's judgment.